IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Judge John L. Kane

Civil Action No. **08-cv-02167-JLK**

**WILDEARTH GUARDIANS, a not-for-profit corporation**,

     Petitioner,

v.

**UNITED STATES FOREST SERVICE, a federal agency within the U.S. Department of Agriculture,**
**RICK CABLES, in his official capacity as Regional Forester of the U.S. Forest Service's Rocky Mountain Region,**
**CHARLES S. RICHMOND, in his official capacity as Supervisor of the Grand Mesa, Uncompahgre, Gunnison National Forest,**
**UNITED STATES DEPARTMENT OF THE INTERIOR, a federal agency, and**
**WILMA LEWIS, in her official capacity as Assistant Secretary, Land and Minerals Management, U.S. Department of the Interior,**

     Respondents, and

**MOUNTAIN COAL COMPANY,**

     Intervener-Respondent

---

## MEMORANDUM OPINION AND ORDER

---

Kane, J.

     The West Elk Coal Mine is a subterranean coal mine located near Paonia, Colorado.

Operated since 1981 by the Mountain Coal Company ("MCC"), a subsidiary of the St. Louis,

Missouri-based Arch Coal Company, the mine largely underlies lands managed by the Grand

Mesa, Uncompahgre, Gunnison National Forest. As a result of MCC's mining activities,

significant quantities of methane, a highly combustible gas which poses a significant safety risk,

is released into the underground mine.[1]  Of great significance to WildEarth Guardians, methane is also a potent greenhouse gas that traps heat in the atmosphere twenty-one times more effectively than carbon dioxide.

In order to alleviate the safety hazard posed by the accumulation of methane, MCC has in the past vented the methane produced in its mining operations directly into the atmosphere.  Such venting has been accomplished by building roads on top of the area to be mined, bulldozing a well pad, and drilling into the coal seam from Forest Service land.  Since approximately 2002, MCC's mining (and venting) activities have been concentrated in (and above) a geologic formation known as the "B seam."  MCC has, however, sought state and federal approval for a plan to expand its mining operations into a different formation – the "E seam."  As part of the permitting process, MCC proposed to address methane in the E seam as it had in the B seam – venting methane directly into the atmosphere.

Venting of the E seam would require the construction of twenty-three miles of new roads, 146 well pads, and 168 methane drainage wells.  As a result, the expansion into the E seam required modification of the existing mine plan and implicated a variety of statutory regimes: NEPA, the Minerals Leasing Act, and the Surface Mining Control and Reclamation Act.  Accordingly, the expansion required the consent of the Forest Service, the recommendation of both the Colorado Division of Reclamation Mining and Safety ("DRMS") and the Office of Surface Mining ("OSM"), and the approval of the Secretary of the Interior.  MCC sought and received the necessary consent (the Forest Service notified OSM and DRMS of its consent on

---

[1]  According to the U.S. Environmental Protection Agency, the West Elk Mine is currently the fourth largest emitter of methane from an underground coal mine in the United States.

June 6, 2008)[2]; recommendations (DRMS issued a proposed decision on Phase I on June 9, 2008, and on Phase II on Nov. 14, 2008, and OSM recommended approval of Phase I on July 23, 2008 and Phase II on December 10, 2008); and approval (DOI Assistant Secretary Stephen Allred approved the mining plan modification for the first phase of the expansion on July 31, 2008 and for the second phase of the expansion on January 15, 2009) for these modifications.

As a condition of his approval, however, Assistant Secretary Allred included a provision requiring MCC to "capture all coalbed gas that would otherwise be vented . . . if such capture is economically feasible and does not jeopardize the safety or health of the miners. The capture operations must comply with the terms of the amended [coal] leases . . .." Accordingly, MCC negotiated amendments to its existing coal leases reflecting this requirement, and on January 14, 2009, the Bureau of Land Management amended MCC's leases for the coal to be mined in the E seam expansion.

WildEarth Guardians challenges the four agency decisions which allowed MCC to proceed with its expansion into the E seam: the Forest Service's consent, the Assistant Secretary's approval of Phase I and Phase II of the expansion, and the BLM's amendment of the existing leases.[3] WildEarth Guardians alleges that the actions of the Forest Service and the

---

[2] As part of this process, the Forest Service prepared a Draft EIS and a Final EIS; issued a Record of Decision; and, subsequent to an administrative appeal, a Revised Record of Decision.

[3] MCC argues WildEarth Guardians is only challenging the EIS upon which the subsequent decisions were based and the only documents properly included in the Mine Plan Modification Administrative Record are those directly relating to and pre-dating that decision. I find this argument without merit. As the Respondents recognize, WildEarth Guardians is challenging four different decisions, each of which was based, in part, on the challenged EIS. Respondents' Opposition to Petitioner's Motion to Compel Completion of the Administrative Record (Doc. 72), 7-12. The Administrative Records properly include all documents related to

Assistant Secretary are based on an inadequate EIS which failed to analyze a range of reasonable alternatives to methane venting, failed to analyze measures to mitigate impacts of methane venting, and failed to analyze the impacts of methane venting. Furthermore, they allege that BLM completely failed to analyze the environmental impacts of the coal lease amendments.

As these decisions are based on two distinct decision making processes (the decisions relating to the mine plans and the decision to amend the coal leases), the Respondents prepared two independent Administrative Records – the Mine Plan Modification Administrative Record and the Lease Amendment Administrative Record. In their Motion to Compel Completion of the Administrative Records (Doc. 70), WildEarth Guardians challenges the sufficiency of each of these Administrative Records. In its motion, WildEarth Guardians argues that (1) Respondents have failed to provide the full records upon which they directly or indirectly relied in making the decisions which are the subject of this challenge and (2) Respondents have improperly asserted the attorney-client privilege in withholding certain materials. WildEarth Guardians urges that the Respondents should be compelled to include these materials in the appropriate Administrative Records in order to allow meaningful judicial review of the challenged agency actions. For the reasons stated below, this motion is GRANTED in part and DENIED in part.

LEGAL STANDARDS

WildEarth Guardians challenges the Respondents' actions under the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA"). As this statute fails to define or specify the standard of review to be used in examining the Respondents' actions, the Administrative Procedures Act ("APA"), 5 U.S.C. § 500, *et seq.*, provides the framework for this

───────────────────

and pre-dating the challenged decisions.

appeal. Accordingly, I must apply the standards articulated in the APA in considering the merits of WildEarth Guardians' Motion to Compel Completion of the Administrative Record.

*Judicial Review of Informal Rulemaking under the APA*

Under the APA, I review Respondents' informal rulemaking to determine if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). As the Supreme Court held in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971), "the generally applicable standards of § 706 require the reviewing court to engage in a substantial inquiry." *Id.* at 415. At the same time, the Supreme Court acknowledged "the Secretary's decision is entitled to a presumption of regularity." *Id.* The Court emphasized, however, that the "presumption is not to shield [the Secretary's] action from a thorough, probing, in-depth review." *Id.* The tension inherent in these mandates is revealed by the Court's own declaration that though "this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.* at 416.

In conducting my review of Respondents' actions, I must balance these mandates. In order to afford appropriate deference, I review the administrative agency's decision as an appellate body. S*ee Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir. 1994). As a result, I apply the Federal Rules of Appellate Procedure and, generally, limit my review to the evidence relied upon by Respondents in reaching the challenged decision. *Id.* at 1580. In order to ensure a "substantial inquiry," however, I also apply a variety of rules and exceptions consistent with my responsibility to ensure meaningful judicial review. Most relevant to the instant controversy, I apply this general framework to the process of determining the sufficiency

of the Administrative Record submitted by Respondents.

*Judicial Review of the Sufficiency of the Administrative Record*

The APA directs that "the court shall review the whole record or those parts of it cited by a party . . .." 5 U.S.C. § 706. The definition of the "whole record" is not entirely clear, but in *Overton Park* the Supreme Court directed lower courts to confine their review of agency decisions to "the full administrative record that was before the Secretary at the time he made his decision." 401 U.S. at 420. The Court clarified this mandate in *Camp v. Pitts*, 411 U.S. 138 (1973), stating that "[t]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Id.* at 142; *see also Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) ("The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court").

Consequently, in accordance with my role in reviewing agency action under § 706, I begin my review of the sufficiency of the submitted Administrative Record by applying a "presumption of regularity" to the record as it is designated by the agency. In order to ensure a "probing inquiry" and a "thorough, probing, in-depth review," however, I also consider the exceptions by which Petitioners may prove the insufficiency of a record as designated by the agency and introduce additional documentation and evidence. Though courts differ in their formulation and application of these exceptions,[4] such documentation and evidence generally takes two distinct,

---

[4] As illustration of the different approaches taken by lower courts in conducting review under § 706, *compare Cronin v. U.S. Dep't of Agric.*, 919 F.2d 439, 444 (7th Cir. 1990) ("Confining the district court to the record compiled by the administrative agency rests on practical considerations that deserve respect. Administrative agencies deal with technical questions, and it is imprudent for the generalist judges of the federal district courts and courts of appeals to consider testimonial and documentary evidence bearing on those questions unless the

yet often confused, forms: (1) materials which were actually considered by the agency, yet omitted from the administrative record ("completing the record"); and (2) materials which were not considered by the agency, but which are necessary for the court to conduct a substantial inquiry ("supplementing the record").[5] In the instant controversy, WildEarth Guardians seeks to "complete the record" with documents it asserts were before the agency decision makers at the time they made the challenged decisions.

*Completing the Record*

In order to decide whether the administrative record submitted by Respondents is complete I must determine whether the record contains "all documents and materials directly or indirectly considered by the agency." *Bar MK Ranches v. Yeutter*, 994 F.2d. 735, 739 (10th Cir. 1993). Consistent with the deference owed an agency under § 706, I assume that the agency properly designated its record absent clear evidence to the contrary. *Id.* at 740. Therefore, the burden to rebut the presumption of a complete record initially rests with Petitioners who must

_____

evidence has first been presented to and considered by the agency") *with Asarco, Inc. v. U.S. Envtl. Prot. Agency*, 616 F.2d 1153, 1160 (9th Cir. 1980) ("The court cannot adequately discharge its duty to engage in a 'substantial inquiry' if it is required to take the agency's word that it considered all relevant matters").

[5] Such confusion has significant consequences for courts and litigants. There are meaningful differences between the standard for establishing that an agency should be required to "complete the record" with documents it actually considered versus the showing required to establish that a court should "supplement the record" with materials which were not before the agency when it made the challenged decision. For an excellent discussion of the differences between "completing the record" and "supplementing the record" see *Cape Hatteras Access Pres. Alliance v. U.S. Dep't of Interior*, 667 F. Supp. 2d 111 (D.D.C. 2009). Perhaps unnecessarily contributing to the confusion, I use terminology conflicting with the *Cape Hatteras* court (what I term "completing the record," the *Cape Hatteras* court refers to as "supplementing the record;" what I term "supplementing the record," the *Cape Hatteras* court refers to as "going beyond the record"). It is my belief, however, that the terminology used in this opinion is most logically consistent with the underlying differences and has the greatest promise of eliminating any confusion.

show by clear evidence that the record fails to include documents or materials considered by Respondents in reaching the challenged decision.

As the circuits have not clearly articulated what quantum of proof is required to constitute "clear evidence" sufficient to overcome the presumption of a properly designated record, *compare Natural Res. Def. Council v. Train*, 519 F.2d 287, 291 (D.C. Cir. 1975)(finding an affidavit by counsel which specified omitted documents, as well as the agency's failure to deny omission, overcame presumption) *with Bar MK Ranches*, 994 F.2d at 740 (finding Petitioners did not overcome burden when they failed to allege facts showing that documents were or were not part of the materials considered by the agency decision makers) *and Dopico v. Goldschmidt*, 687 F.2d 644, 654 (2d Cir. 1982)(requiring a showing that fundamental documents normally in record are conspicuously absent),[6] the Parties to this matter dispute the nature of the showing required to meet this burden. In light of the parties' opposing views as to the nature of Petitioner's burden in rebutting the presumption of regularity and the unsettled state of the law on this question, I think it useful and necessary to identify what constitutes "clear evidence."

In *Bar MK*, the Tenth Circuit suggested that the clear evidence burden requires parties challenging the sufficiency of the record to allege specific facts that show documents were or were not considered by the agency decision makers. 994 F.2d at 740. Subsequently, at least one court has required a Petitioner to allege facts showing irregularity of the record with a high degree of specificity. *Pacific Shores Subdivision v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d

---

[6] Two recent orders in this district decided whether to complete administrative records without meaningful discussion of the applicable standard: both merely stated that the challengers met their burden without specifying what evidence supported overcoming the presumption of regularity. *See Ark Initiative v. U.S. Forest Serv.*, 2007 U.S. Dist. LEXIS 43958, *3 (D. Colo. June 18, 2007); *Wilderness Soc'y v. Wisely*, 524 F. Supp. 2d 1285, 1295)(D. Colo. 2007).

1, 6-7 (D.D.C. 2006).  In *Pacific Shores*, the court reasoned that the Petitioner could not simply meet its burden by asserting, speculatively, that documents were relevant or before the agency at the time it made its decision.  *Id.*  Rather, to meet the burden, Petitioner was required to both "identify reasonable, nonspeculative grounds for its belief that the documents were considered by the agency and not included in the record" and prove that documents were before the agency's decision makers.  *Id.*  The court stated that the Petitioner should have described "when the documents were presented to the agency, to whom, and under what context."  *Id.* at 7.  Because the Petitioner failed to do so, it failed to rebut the presumption that the record was properly designated.  *Id.*

For several reasons, I find this articulation of the showing necessary to establish "clear evidence" persuasive.  First, the clear evidence burden stems from the general rule that, in the absence of evidence to the contrary, public officers will be rebuttably presumed to have performed their duties properly and not acted illegally.  Am. Jur. 2d. Admin. Law § 564 (2009).  A party challenging the validity of an agency action must make a convincing showing by clear and satisfactory evidence that the decision was invalid.  *Id.*  It thus follows that a party challenging an agency's compilation of its own administrative record must make a similarly convincing showing.  Second, a substantial burden gives proper meaning to the Supreme Court's holdings and dicta in both *Camp*, 411 U.S. at 142 , and *Fla. Power & Light Co.*, 470 U.S. at 744, which state that the primary task of a court under the APA is to review "the record the agency presents to the reviewing court."  470 U.S. at 744.  A party attempting to convince a reviewing court to expand the scope of its review properly bears a sizeable burden if it is to convince the court to forego the customary deference owed an agency's determination of what constitutes the

record. Third, given that the D.C. Circuit hears more administrative appeals than any other

circuit,[7] I find it appropriate to defer to the experience of the courts in that circuit and rely on their

well-reasoned analyses of the proper burden to overcome administrative regularity. Therefore,

following the standard set forth in *Pacific Shores*, in order to overcome the presumption of

regularity and meet the burden of proving that the record designated by the agency is incomplete,

WildEarth Guardians must clearly set forth in its motion: (1) when the documents were presented

to the agency; (2) to whom; (3) and under what context. Having determined the showing

necessary to meet the burden of establishing clear evidence, I now turn my attention to the

substantive showing required to demonstrate that documents or materials were "directly or

indirectly considered by the agency."

The rationale for limiting the record to those documents directly or indirectly considered

by relevant agency decision makers is grounded in the need to afford adequate deference to

agency expertise while ensuring meaningful judicial review of the full administrative record. *Bar

MK*, 994 F.2d at 739. Determining whether and what documents and materials were directly

considered by the relevant decision makers in the decision making process, based on clearly

alleged facts, is ordinarily a straightforward proposition. *See, e.g, id.* at 739-40 (finding relevant

decision makers to be those individuals specified in the agency's established decision making

process). Substantial review must reach these materials because they clearly underlie any rational

basis for the decision. Despite Respondents' argument to the contrary, the whole record also

includes documents besides those which "literally pass[ed] before the eyes of the final agency

---

[7] To illustrate the sheer number of APA reviews that courts in the D.C. Circuit undertake, a Shepard's analysis of 5 U.S.C. § 706 results in over 22,000 results. Of these, the D.C. Circuit heard 2,946. Compare the 10th Circuit with 751, 11th Circuit with 500, 2nd Circuit with 890, and 7th Circuit with 658.

decisionmaker[s]." *Clairton Sportsmen's Club v. Pa. Turnpike Comm'n*, 882 F. Supp. 455, 465 (W.D. Pa. 1995); *Miami Nations of Indians of Ind. v. Babbitt*, 979 F. Supp. 771, 777 (N.D. Ind. 1996).

By requiring agencies to include in the Administrative Record documents and materials indirectly considered in the decision making process, *see Bar MK*, 994 F.2d at 739-40, the Tenth Circuit implicitly acknowledges that senior administrators often make decisions based on the work of support staff within the agency or on other experts.[8]  The chain of indirect consideration cannot, however, reach <u>all</u> documents within the agency.  A reviewing court's determination of the sufficiency of a challenged administrative record will almost always turn on the scope of documents the court determines to be indirectly considered and therefore properly included in the record.

In fulfilling its duty to exercise substantial review of the complete administrative record, a court may be tempted to allow inclusion in the record of any relevant document contained in an agency's file cabinets, reasoning that some agency staff considered these documents at some point.  Such a broad interpretation of "indirectly considered," however, fails to give appropriate deference to the agency's designation of the record. [9]  *See Axiom Res. Mgmt. v. United States*, 564

---

[8]  Respondents fail to recognize that documents indirectly considered by decision makers are, in some cases, properly included in the Administrative Record.

[9]  Of course, often will be the case that challengers to the agency are attempting to show evidence that the agency decision makers were arbitrary and capricious in making their decision because they *should have* considered certain documents lying in a file cabinet in a field office and did not.  *See, e.g.*, *Kent County v. U.S. Envtl. Prot. Agency*, 963 F.2d 391, 396 (D.C. Cir. 1992)("Had the EPA simply checked the files at the Region III office, it would have found the documents . . . [that] relate to the position of the agency's own experts on the question central to the case").  In such an instance, challengers are seeking to supplement, not complete, the record, and the court must look to a different test than whether the documents were considered directly or indirectly by the agency, and apply a different burden.  *See id.* (allowing EPA documents into

F.3d 1374 (Fed. Cir. 2009)(finding that the lower court abused its discretion in allowing the parties to liberally supplement the Administrative Record). This is inconsistent with the Supreme Court's finding that a court reviewing an agency decision under § 706 is to afford substantial deference "to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co.*, 470 U.S. at 744.[10]

If, however, a court applies too narrow a test in determining which materials were indirectly considered, the court risks frustrating judicial review by allowing exclusion of materials that may have influenced the agency's decision, including any evidence that was counter to the agency's position. *See Wilderness Soc'y v. Wisely*, 524 F. Supp. 2d 1285, 1295 (D. Colo.2007) (documents which were "considered" are "not simply those that the agency relied upon in reaching its decision"); *Utah Envtl. Cong. v. Richmond*, 483 F.3d 1127, 1134 (10th Cir. 2007). As is most always the case, a Goldilocks analysis yields the most prudent approach – one that is just right. I am most persuaded by the standard articulated by the court in *Amfac Resorts LLC v. U.S. Dep't of Interior*, 143 F. Supp. 2d 7 (D.D.C. 2001). "[I]f the agency decisionmaker based his decision on the work and recommendations of subordinates, those materials should be included

---

the record). For more discussion concerning the differences between "completing the record" and "supplementing the record," *see supra* n.4.

[10] The D.C. Circuit explained the rationale for such a limitation in *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*: "Judicial reliance on an agency's stated rationale and findings is central to a harmonious relationship between agency and court, one which recognizes that the agency and not the court is the principal decision maker. Were the courts cavalierly to supplement the record, they would be tempted to second-guess agency decisions in the belief that they were better informed than the administrators empowered by Congress and appointed by the President." 751 F.2d 1287, 1325-26 (D.C. Cir. 1986)(en banc).

[in the record]." *Id.* at 12.[11]  The proper touchstone remains the decision makers' actual consideration, and a party moving to complete the record must show with clear evidence the context in which materials were considered by decision makers in the relevant decision making process.  For example, if a party moves to include a study that was cited in the recommendations of subordinates, the party need not show that the decision maker read the study, but the party must show that the study was so heavily relied on in the recommendations that the decision maker constructively considered it.  *See WildEarth Guardians v. Salazar*, 2009 U.S. Dist. LEXIS 110588, *11 (D. Ariz. 2009).  I find that this test, consistent with the standard articulated in *Bar MK*, allows me to afford appropriate deference to the agency's designation of the Administrative Record while conducting a substantial review of a record that consists of materials directly or indirectly considered by the agency decision makers –  "nothing more and nothing less." 994 F.2d at 739.

## ANALYSIS

Having clarified the burden and the proper scope of an Administrative Record, I now determine whether I may properly compel completion of the Administrative Records with the exhibits attached by WildEarth Guardians to its Brief in Support of Motion to Compel Completion of Administrative Records (Doc. 71).  As Respondents have designated two independent Administrative Records for the relevant decisions, I find it most logical to analyze separately the Mine Plan Modification and the Lease Amendment Administrative Records.

---

[11]  In some cases, such documents may be protected by the deliberative process privilege. Whether such materials are subject to a privilege of deliberative process must be determined on an ad hoc basis.  *Cf. Amfac Resorts*, 143 F. Supp. 2d at 13.  As Respondents have not asserted the privilege for any of the proffered documents, however, I need not consider this issue.

WildEarth Guardians has moved to complete DOI's Mine Plan Modification AR with the following twenty-three documents:[12]

Exhibit 2A:

These are a series of documents attached to Petitioners' Administrative Appeal of the 2008 Record of Decision.

Exhibit 3:

E-mail from Karen Hawbecker, DOI Office of the Solicitor, to John Lewis, BLM Washington Office, et al. (July 28, 2008 6:52 pm) (Doc. 71-9). This e-mail indicates that after the July 28 OSM briefing with the Assistant Secretary, the Assistant Secretary sought input from BLM regarding capture of the vented coal gas.

Exhibit 4:

Email from John A. Lewis, Mining Engineer, BLM Washington Office to Bob M. Anderson, Deputy Assistant Director for Minerals, BLM Washington Office, et al. (July 24, 2008 9:57 am) (Doc 71-10). This e-mail summarizes a phone conference discussing four options for addressing the issues associated with the capture of methane from the West Elk mine and developing a plan of action. As part of this plan of action, the BLM Colorado State Office was to "wait until a policy has been developed [by BLM's Washington Office] before moving forward."

Exhibit 5:

Email from Charlie Beecham, BLM Colorado State Office to John A. Lewis, et al., BLM Washington Office (July 24, 2008 11:01 am) (Doc 71-11). This e-mail contains the a recommendation by the BLM Colorado State Office that the BLM Washington Office pursue the lease modification alternative in order to address concerns about methane venting.

Exhibit 6:

Memorandum re: OSM Call (July 28, 2008)(Doc. 71-12). The memorandum discusses a planned telephone briefing for the Assistant Secretary of Land and Minerals Management which will discuss options for addressing methane at the West Elk mine, as well as

---

[12] For consistency and ease of reference, I use the numbering of exhibits adopted by the Petitioners in their Brief in Support of Motion to Compel (Doc. 71).

OSM's recommendations.

Exhibit 7:

E-mail from John Lewis, BLM Washington Office, to Bob Anderson, BLM Washington Field Office, et al. (July 24, 2008 7:57 am); and E-mail of John A. Lewis, BLM Washington Field Office to James Kohler BLM Utah State Office, et al. (July 28, 2008 8:36 am) (Doc. 71-13). These e-mails contain the options discussed *supra* in Exhibit 4 and solicit input from among others, the BLM Wyoming, Utah, Colorado, and New Mexico State Offices on "the best possible solutions which would allow the CH4 to be developed from the mine boreholes where possible."

Exhibit 8:

E-mail from Gareth Rees, DOI Office of the Assistant Secretary to Ray Brady, et al. (July 29, 2008 10:40 am) (Doc. 71-14). This e-mail invites a number of OSM, BLM, and Office of the Solicitor staff to attend a meeting on July 31 at 1 pm "to discuss the West Elk Mine Plan."

Exhibit 9:

E-mail from Phil Perlewitz, BLM Wyoming State Office to Mitchell Leverette, BLM Division Chief, Solid Minerals, et al. (July 29, 2008 11:29 am) (Doc. 71-15). This e-mail contains an evaluation by the BLM Wyoming State Office of potential alternatives for addressing coal mine methane in the wake of the IBLA's *Vessels* decision.

Exhibit 10:

E-mail from John A. Lewis, BLM Washington Office to Phil Perlewitz, BLM Wyoming State Office, et al. (July 29, 2008 12:37 am) (Doc. 71-16). This e-mail show BLM staff agreeing with one option over others in their deliberations.

Exhibit 11:

E-mail from Tim Spisak, Chief, BLM Division of Fluid Minerals to Emily Morris, DOI's Office of the Solicitor, et al. (July 30, 2008 12:42 pm) (Doc. 71-17). This e-mail contains two e-mail trails which, together with Karen Hawbecker's summary and Tim Spisak's and Emily Morris's discussions of the past two days informed the briefing paper discussing options for addressing methane capture.

Exhibit 12:

Calendar Entry for West Elk Mine Plan Issue Meeting, scheduled for July 30, 2008 (Doc. 71-18). This entry reveals that the purpose of the meeting was to "Brief Mike [Nedd,

BLM Assistant Director for Minerals and Realty Management] on recommended BLM policy position on vent gas disposition" concerning the "West Elk Mine Plan,"and that it was to involve Tim Spisak, Chief, BLM Division of Flue Minerals and Dennis Daugherty and Karen Hawbecker of the DOI Office fo the Solicitor. Deborah Watkins, John A. Lewis, and Steve Salzman were also invited to the meeting.

Exhibit 13:

Information Memorandum for the Assistant Secretary of Land and Minerals Management (July 31 2008) (Doc. 71-19). This draft information memorandum lays out options for requiring the capture of methane released by federal coal lessees from active underground coal mines.

Exhibit 14:

E-mail from Emily Morris, DOI Office of the Solicitor to Tim Spisak, Chief, BLM Fluid Minerals Division, et al. (July 30, 2008 4:46 pm) (Doc. 71-20). This e-mail contains an attached memo concerning the options for requiring the capture of methane released by federal coal lessees.

Exhibit 15:

E-mail from Emily Morris, DOI Office of the Solicitor to Kristen C. Guerriero, DOI Office of the Solicitor (July 31, 2008 11:23 am) (Doc. 71-21). This e-mail contains language drafted and reviewed by DOI attorneys that was later included verbatim in the Assistant Secretary's decision.

Exhibit 16:

E-mail from Karen Hawbecker, DOI Office of the Solicitor to Mike Nedd, BLM Assistant Director for Minerals and Realty Management, et al. (July 31, 2008 2:45 pm) (Doc. 71-22). This e-mail reveals that the lease amendment language was then circulated to BLM minerals staffers for review prior to its submission to the Assistant Secretary.

Exhibit 17:

E-mail from Mitchell Leverette, BLM Division Chief, Solid Minerals to Tim Spisak, Chief, BLM Fluid Minerals Division, et al. (July 31, 2008 3:27 pm) (Doc. 71-23). This e-mail reveals that the circulated language was approved by BLM's solid minerals chief.

Exhibit 18:

E-mail from Mike Nedd, BLM Assistant Director for Minerals and Realty Management to Karen Hawbecker, DOI Office of the Solicitor (July 31, 2008 3:28 pm); E-mail from

Karen Hawbecker to Mike Nedd (July 31, 2008 3:28 pm) (Doc. 71-24). These e-mails reveal that the circulated language was approved by BLM via BLM Assistant Director for Minerals and Realty Management Mike Nedd and that Brent Wahlquist, director of OSM, then "surnamed it for OSM," and only after these recommendations was the document "delivered" to DOI's Deputy Assistant Secretary (Foster Wade) for approval.

Exhibit 19:

E-mail from Bill Lesage, Mining Engineer, BLM Washington Office to Karen Hawbecker, DOI Office of the Solicitor (November 6, 2008 5:01 pm), attaching letter of Foster Kirby, Acting Manager, Northwest Branch, OSM to Barbara Sharrow, Field Manager, BLM Uncompahgre Field Office (October 17, 2008) (Doc. 71-25). This e-mail, and the attached letter, demonstrate that OSM sought information from BLM regarding steps taken to ensure compliance with the July 31, 2008 Mine Plan Modification. OSM also inquired whether the methane capture provision should be extended to the January 2009 Mine Plan Modification.

Exhibit 20:

E-mail from Emily Morris, DOI Office of Solicitor to Fred Block, OSM Washington Office (November 6, 2008 5:01 pm) (Doc. 71-26). This e-mail demonstrates that the Solicitor's Office continued to work with OSM and other agencies in drafting the language of amendments to the Mine Plan. It contains draft language for the January 2009 Mine Plan Modification identical to the language used in the July 31, 2008 Mine Plan Modification.

Exhibit 21:

E-mail from Emily Morris, DOI's Office of the Solicitor to Brent Wahlquist, Director, OSM (December 15, 2008 2:53 pm) (Doc. 71-27). This e-mail provided the OSM Director with two options for addressing methane capture – one in case MCC's leases were amended to address capture and one in case the leases were not amended.

Exhibit 22:

E-mail from Brent Wahlquist, OSM Director to Emily Morris, DOI's Office of the Solicitor, et al. (December 16, 2008 8:33 am) (Doc. 71-28). This e-mail shows OSM's approval and adoption of the language addressing methane capture in the January 2009 Mine Plan Modification developed by the DOI Office of the Solicitor.

Exhibit 23:

E-mail from Emily Morris, DOI Office of the Solicitor to Bill Lesage, Mining Engineer, BLM Washington Office (December 16, 2008 2:36 pm) (Doc. 71-29). This e-mail shows

that Assistant Secretary Allred wanted to wait until the Lease Amendements were complete before issuing the January 2009 Mine Plan Modification.

Exhibit 24:

E-mail from Brent Wahlquist, OSM Director to Sterling Rideout, OSM, et al. (December 17, 2008 9:35 pm) (Doc. 71-30). This e-mail demonstrates that the OSM Director directed his staff to amend the January 2009 Modification with the language supplied by DOI's Office of the Solicitor so that he could surname the modification and send it to Assistant Secretary Allred as soon as possible.

I appreciate the thoroughness with which WildEarth Guardians' presented the documents it seeks to include within the Administrative Record. In accordance with the "clear evidence" standard articulated in *Pacific Shores*, WildEarth Guardians' submission indicates (1) when the documents were presented to the agency; (2) to whom; (3) and under what context. Having determined that WildEarth Guardians' has complied with this requirement, I must now determine whether the proffered documents were directly or indirectly considered by the relevant decision makers.[13]

The documents submitted by WildEarth Guardians for inclusion in the Administrative Records can be classified in one of three ways. First, there are documents that were directly considered by the relevant decision makers. Second, there are documents that were indirectly considered by the relevant agency decision makers as they were recommendations (or materials inherent to recommendations) of subordinates or staff considered by the decision makers. And, third, there are documents which were neither directly nor indirectly considered, but which show

---

[13] Based on the motions of the parties and the requirements under NEPA, the Minerals Leasing Act, and the Surface Mining Control and Reclamation Act, the relevant decision makers in the Mine Plan Modification decision were: DOI Assistant Secretary C. Stephen Allred, OSM Director Brent Wahlquist; the Forest Service decision makers who adopted the ROD that concurred with OSM decision (Forest Supervisor Charles Richmond and Acting Deputy Regional Forester Craig Bobzien); as well as any relevant decision maker(s) from the Colorado Division of Reclamation Mining and Safety (DRMS).

the relation of the materials to the relevant decision makers. I will discuss each of these categories in turn.

The documents directly considered by the relevant decision makers in developing and approving the Mine Plan Modification include Exhibits 2A, 6, 13, 21, 22, and 24.[14] WildEarth Guardians clearly show, and the government has failed to rebut, that these materials passed directly before the eyes of the Assistant Secretary and other relevant decision makers. They are properly included in the complete record.

Many of the documents submitted by WildEarth Guardians fall into the second category – documents indirectly considered by the relevant decision makers: Exhibits 4, 5, 7, 9, 10, 11, 15, 17, 18, 19, 20, and 23. WildEarth Guardians has shown with clear evidence that many of these documents were the work and recommendations of subordinates upon which the agency decision makers based their decision. Despite Respondents' argument that these documents should not be included in the Administrative Record because they were not directly considered by the relevant decision makers, if they have been indirectly considered by the decision makers they should be included in the record. *Amfac Resorts*, 143 F. Supp. 2d at 12.

Exhibits 4 and 5 are BLM offices' internal deliberations and recommendations regarding leasing amendments, which Assistant Secretary Allred considered in his decision. Exhibits 15, 17, 18, 20, and 23 demonstrate that DOI attorneys drafted language for the Assistant Secretary's decision and sent it to BLM and OSM offices for approval. The draft language and the approvals were indirectly considered by the Assistant Secretary because they were recommendations about

_____

[14] In their Opposition to Petitioners' Motion to Compel Completion of the Administrative Record, Respondents acknowledge that Exhibits 2A and 13 are properly included in the Mine Plan Modification Administrative Record. *See id.* at 19-20 and 23, n.8.

the decision that the Assistant Secretary ultimately signed.  Exhibits 7, 9, 10, and 11 involve

BLM's internal deliberations with regards to choosing the best alternative for coalbed methane in

the lease.  These emails demonstrate that these deliberations so directly served as the basis for the

recommendation ultimately passed on to the Assistant Secretary and other relevant decision

makers that the decision makers constructively considered these deliberations. See *WildEarth*

*Guardians v. Salazar*, 2009 U.S. Dist. LEXIS 110588, *11 (D. Arix. 2009).  Exhibit 19 reflects

internal discussions between OSM and BLM, relevant to the development of the January 2009

Mine Plan Modification.  As other exhibits demonstrate, this language was ultimately considered

by OSM Director Brent Wahlquist.

Finally, several of the documents presented by WildEarth Guardians do not appear to have

been directly or indirectly considered by decision makers. Instead, they are descriptive accounts

of communications between agencies, useful for the purpose of demonstrating who the relevant

decision makers were and what they considered.  These documents support the inclusion in the

record of other materials set forth by WildEarth Guardians.  As these documents were not directly

or indirectly considered by the relevant decision makers, however, they are not properly included

in the Mine Plan Modification Administrative Record.  These include Exhibits 3, 8, 12, 14, and

16.  Exhibit 3 most clearly illustrates the purpose of these documents. This email describes a

meeting between Assistant Secretary Allred and DOI staff, the OSM director, OSM officials, and

attorneys from the Solicitor's Office about the mine plan amendment, including the issues

regarding which staff briefed the Assistant Secretary. WildEarth Guardians alleged in its

Memorandum in Support of Motion to Compel Completion of the Administrative Records that:

> this email, mentioning numerous DOI employees, and sent to over 20 BLM and
> DOI staff, demonstrates the universe of officials who were directly or indirectly

involved in Assistant Secretary's mine plan modification decision. It also shows that documents informing BLM's policy decision on methane venting were integral to the Assistant Secretary's decision; indeed, that the ultimate decisionmaker awaited their decision and input on methane venting before he would make his decision on the mine plan modification.

Doc. 71, 24. Thus, though this email may have been considered by subordinates giving recommendations to the relevant decision makers, it was not so heavily relied on in those recommendations that the relevant decision makers constructively considered it. This e-mail does, however, show whose decisions and recommendations mattered in the decision making process. Exhibits 8, 12, and 16 similarly describe meetings and their alleged purposes to demonstrate who was involved and under what context. Exhibit 14 merely states who prepared a draft memo.

In light of my adoption of the *Pacific Shores* "clear evidence" standard, WildEarth Guardians properly included reference and description of these documents in its Brief to Support its Motion to Compel. Even though these documents are not properly included in the Administrative Record forming the basis for judicial review of the challenged agency action, they are properly considered *in camera* when there is a motion to complete the record in order to establish the context in which the decision was made (i.e., Who were the decision makers? Which subordinates had significant input?).

*Mine Lease Amendment Administrative Record*

WildEarth Guardians has moved to complete DOI's Mine Plan Modification AR with the following eighteen documents:

Exhibit 25:

E-mail from Matthew J. McKeown, DOI Office of the Solicitor to Emily Morris, DOI Office of the Solicitor, et al. (Oct. 21, 2008 10:19 am) (Doc. 71-31). This e-mail reflects

that staff at the DOI's Office of the Solicitor prepared for a meeting with the Assistant Secretary for Land and Minerals Management to discuss coal mine methane venting, AKA "the 'gob' gas issue." Forwarded with the email is a Solicitor's Office "tracking matter" form, which identifies as the key questions to resolve: "(1) How, if at all, can BLM allow a party to capture methane gas released during the process of mining from underground coal mines? (2) If so, how can the coal lease be amended to allow the coal operator to capture the gas?"

Exhibit 26:

E-mail from Karen Hawbecker, DOI Office of the Solicitor to John Kunz, DOI Office of the Solicitor, et al. (Oct. 22, 2008 8:55 am) (Doc. 71-32). The email attaches a draft lease amendment, and makes clear that the Solicitor's office and various staff at BLM's Washington office are part of the team working to help DOI reach a decision on the issue.

Exhibit 27:

E-mail from Kristen Guerriero, DOI Office the Solicitor to Karen Hawbecker, DOI Office of the Solicitor (Oct. 22, 2008 1:53 pm) (Doc. 71-33).  This e-mail reveals the participation of the Fluid Minerals Branch as well as the Solid Minerals Branch in the Lease Amendment negotiations.

Exhibit 28:

E-mail from Karen Hawbecker, DOI Office the Solicitor to Matthew J. McKeown, DOI Office of the Solicitor (Oct. 22, 2008 4:36 pm) (Doc. 71-34).   This e-mail shows that the draft lease amendment was sent to four key BLM staff to help achieve internal agreement about the amending language: Bob Anderson (BLM's Deputy Assistant Director for Minerals, Realty, and Resource Protection), Mitch Leverette (Chief, Solid Minerals Division), Bill LeSage (mining engineer, BLM Washington Office), and Tim Spisak (Chief, Fluid Minerals Division, BLM).

Exhibit 29:

E-mail from Karen Hawbecker, DOI Office the Solicitor to Bill Lesage, mining engineer, BLM Washington Office, et al. (Oct 22, 2008 5:33 pm) (Doc. 71-35). This e-mail chain shows that the draft amendment was sent to the above-named BLM staff for review, as well as to Duane Spencer and Charlie Beecham at BLM's Colorado State Office for their input.  Both these records identify additional federal employees directly involved in lease amendment negotiations.

Exhibit 30:

E-mail from Emily Morris, DOI Office the Solicitor to Sarah Inderbitzin, MMS (Nov. 6,

2008 1:39 pm) (Doc. 71-36). This e-mail demonstrates that the DOI's Office of the Solicitor sought input from staff of the Minerals Management Service (MMS) on how to address royalties in the proposed lease amendment. In its discussion of the options being considered, the e-mail also demonstrates DOI's narrowing the scope of its analysis of options to obtain methane capture.

Exhibit 31:

E-mail chain, Bill Lesage, mining engineer, BLM Washington Office to Karen Hawbecker, DOI Office the Solicitor (Nov. 6, 2008 12:50 pm) (Doc. 71-37). This e-mail contains a discussion concerning the most efficient process for amending the existing lease for the West Elk mine to allow for capture of vented methane.

Exhibit 32:

E-mail chain, Bill Lesage, mining engineer, BLM Washington Office to Charlie Beecham, Colorado BLM Solid Mineral Branch Chief (Nov. 10, 2008 9:10 am) (Doc. 71-38). This e-mail contains discussions relating to the drafting of the lease amendment and indicates that BLM staff understood a proposal to require methane capture was an alternative to the approach BLM proposed here.

Exhibit 33:

E-mail from Emily Morris, DOI Office the Solicitor to Bill Lesage, mining engineer, BLM Washington Office, et al. (Nov. 17, 2008 7:16 am) (Doc. 71-39). This e-mail contains a circulated draft of the lease amendment as well as a number of suggested amendments and comments from key BLM staff.

Exhibit 34:

E-mail from Deborah Gibbs Tschudy, MMS to Emily Morris, DOI Office the Solicitor, et al. (Nov. 17, 2008 11:30 am) (Doc. 71-40). This e-mail contains feedback from the MMS concerning DOI's ability to obtain royalties for ventilation air methane removed from the mine.

Exhibit 35:

E-mail from Benjamin Martin, Acting Deputy Division Chief, Solid Minerals, BLM to Mike Nedd, Washington Office, BLM, et al., forwarding memorandum (Dec. 3, 2008 1:57 pm) (Doc. 71-41). This e-mail contains a memorandum summarizing a meeting that discussed the content of the amendment.

Exhibit 36:

E-mail from Bill Lesage, mining engineer, BLM Washington Office to William Prince, Dorsey & Whitney, et al. (Dec. 16, 2008 8:57 am) (Doc. 71-42). This e-mail contains communication between BLM and MCC.

Exhibit 37:

E-mail from Karen Hawbecker, DOI Office of the Solicitor, to Charlie Beecham, Colorado BLM Solid Mineral Branch Chief, et al. (Dec. 17, 2008 9:55 am) (Doc. 71-43). This e-mail contains a red-line document comparing MCC's counter-offer with BLM's original proposal to amend the coal leases. The document was sent to two BLM staffers – Charlie Beecham and Duane Spencer – who later provided feedback to DOI on how to respond to MCC's offer.

Exhibit 38:

E-mail from Emily Morris, DOI Office of the Solicitor to Kristen Guerriero, DOI Office of the Solicitor, et al. (Dec. 30, 2008 3:29 pm) (Doc. 71-43). This e-mail contains a summary of a phone call between DOI attorneys and MCC representatives, in which the latter explained their concerns with DOI's December 19 proposed lease.

Exhibit 39:

E-mail from Bill Lesage, mining engineer, BLM Washington Office to Mitchell Leverette, BLM Division Chief, Solid Minerals, et al. (Jan. 5, 2009 8:00 am) (Doc. 71-44). This e-mail contains a forwarded article discussing an alternative solution to the leasing of coalbed methane.

Exhibit 40:

E-mail from Emily Morris, DOI Office of the Solicitor to John Kunz, DOI Office of the Solicitor, et al. (Jan. 6, 2009 2:48 pm) (Doc. 71-45). This e-mail is a request for input from MMS on royalty provisions proposed by MCC, and it also reveals the time constraints under which the decision was being made.

Exhibit 41:

E-mail from Emily Morris, DOI Office of the Solicitor to Duane Spencer, Branch Chief, Fluid Minerals, BLM Colorado et al., (Jan. 9, 2009 8:45 am) (Doc. 71-46). This e-mail contains a red-line version of a DOI counter-offer to MCC, circulated to key BLM staff involved in negotiating and commenting on DOI's offers.

Exhibit 42:

E-mail from Emily Morris, DOI Office of the Solicitor to Bill Lesage, mining engineer, BLM Washington Office (Jan. 12, 2009 6:14 pm) (Doc. 71-47). This e-mail demonstrates that the Denver offices of the DOI Office of the Solicitor played an important role in this decision.

As above, in relation to these proffered documents, WildEarth Guardians have met their burden of establishing (1) when the documents were presented to the agency; (2) to whom; (3) and under what context. Accordingly, I must focus my analysis on whether the documents were directly or indirectly considered by the decision makers responsible for the Mine Lease Amendment decision.[15]

As none of the documents offered by WildEarth Guardians were either sent or received by the relevant decision makers, they were not directly considered. Instead, with one exception, they generally fall into one of two categories: either documents that were indirectly considered by the relevant agency decision makers or documents which were neither directly nor indirectly considered, but which show the relation of the materials to the relevant decision makers. The one exception is Exhibit 36, which was improperly submitted for inclusion into the record. As there is no evidence that this e-mail was directly or indirectly considered by relevant decision makers, and it does not reveal information regarding the decision making process, Exhibit 36 is excluded from the Administrative Record.

Exhibits 25, 26, 30, 31, 32, 33, 34, 35, 37, 38, 39, 40, and 41 are all admissible as

---

[15] The Respondents identify BLM's Associate Colorado State Director; a lease amendment decision team that included BLM's Colorado State Director, its Deputy State Director, BLM's Director, the BLM Director's chief of staff; and the office of the Assistant Secretary of Minerals Land Management as the principal decision makers for the Mine Lease Amendment decision. As with all agency actions, the identification of relevant decision makers is entitled to deference and is presumed proper absent clear evidence to the contrary.

documents indirectly considered by the relevant agency decision makers. These exhibits reveal that staff attorneys in the DOI's Office of the Solicitor were intricately involved in the process of developing the language of the Lease Amendment which the relevant decision makers ultimately adopted. Moreover, these exhibits contain relevant information that staff attorneys directly considered and used to draft the Lease Amendment. For example, Exhibit 33 is an e-mail trail between attorneys in the Office of the Solicitor and BLM staff that contains a circulated draft of the lease amendment and suggested amendments and comments. Because exhibits such as these contain information that directly served as the basis for the Lease Amendment, they were indirectly considered by the relevant decision makers and are properly included in the Lease Amendment Administrative Record.

Exhibits 27, 28, 29, and 42, though not appropriate for inclusion in the Lease Amendment Administrative Record, are properly considered *in camera* as evidence of the parties involved in the decision making process.

*Remedy*

Respondents and Respondent-Interveners argue that, upon a finding that a record is incomplete, the appropriate remedy is to remand the entire record to the agency. In support of this argument, they cite a line of cases easily distinguishable from the case at hand. This is not, as in *Fla. Power & Light*, 470 U.S. at 744, a case where the record is so utterly deficient that I am unable to evaluate the challenged agency decisions. Nor is it a case in which WildEarth Guardians or Respondents attempt to enlarge the scope of review to documents and materials which were not before the agency at the time it made its decision. *See Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1245-47 (11th Cir. 1996)

(upholding district court decision to prohibit plaintiff from taking discovery); *Pub. Power Council v. Johnson*, 674 F.2d 791, 794 (9th Cir. 1982) (permitting discovery concerning agency contracts because circumstances justified going beyond the AR); *Asarco, Inc.*, 616 F.2d at 1159-61(finding district court should not have permitted agency testimony to explain agency decision, but instead should have relied on the record before the agency); *Cronin*, 919 F.2d at 444-45 (finding district court improperly held evidentiary hearing because court's review should have been confined to the administrative record). On the contrary, WildEarth Guardians merely seek to complete the record with specifically identified documents which they have shown were before the agencies at the time they made the challenged decisions.

Nonetheless, when the agency record is inadequate, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Sierra Club-Black Hills Group v. U.S. Forest Serv.*, 259 F.3d 1281, 1289 (10th Cir. 2001)(quoting *Fla. Power & Light Co.*, 470 U.S. at 744). I am hesitant to allow inclusion of documents self-selected by WildEarth Guardians from the universe of documents provided in response to their FOIA request without giving Respondents an opportunity to include additional materials which may provide additional context to the challenged decisions. Non-agency parties should not be allowed to complete the record with only those underlying documents that are favorable to their challenge. *See WildEarth Guardians v. Salazar*, 2009 U.S. Dist. LEXIS 110588, *10 (D. Ariz. 2009). I believe it most appropriate to remand the Administrative Records to Respondents; Respondents may not, however, complete the record with documents which were not directly or indirectly considered by the relevant decision makers.

With these considerations in mind, I remand the Administrative Records to the

Respondents for completion by adding all documents meeting the proper legal standard: those documents that were "directly or indirectly considered" or relied upon by the agency at the time the agency was making its decision. *Bar MK Ranches*, 994 F.2d at 739. This should include, at a minimum Exhibits 2A, 4, 5, 6, 7, 9, 10, 11, 13, 15, 17, 18, 19, 20, 21, 22, 23, and 24 for the Mine Plane Modification Administrative Record and Exhibits 25, 26, 30, 31, 32, 33, 34, 35, 37, 38, 39, 40, and 41 for the Lease Amendment Administrative Record.

*Attorney-Client Privilege*

WildEarth Guardians also argue that Respondents improperly assert the attorney-client privilege in redacting portions of nine pages (390-398) of documents in the Lease Amendment Administrative Record. The privilege "protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege." *Fisher v. United States*, 425 U.S. 391, 403 (1976); *see also United States v. Johnston*, 146 F.3d 785, 794 (10th Cir. 1998)(finding that, in order to be protected by the attorney-client privilege, a communication between a lawyer and client must relate to legal advice or strategy). The privilege does not, however, allow the withholding of documents simply because they are the product of an attorney-client relationship. *See Motley v. Marathon Oil Co.*, 71 F.3d 1547, 1550-51 (10th Cir. 1995). Only confidential information is protected by the privilege; if the information has been or is later shared with third parties, the privilege does not apply. *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force,* 566 F.2d 242, 254 (D.C. Cir. 1977); *see also United States v. Ryans*, 903 F.2d 731, 741 n. 13 (10th Cir. 1990)(noting waiver of the attorney client privilege where the substance of the communication was disclosed to a third party, even inadvertently).

In order to assert the privilege successfully, the Respondents must show that the privilege

applies to the documents at issue. *See United States v. Phelan*, 3 Fed. Appx. 716, 718 (10th Cir. 2001)(citing *In re Foster*, 188 F.3d 1259, 1264 (10th Cir. 1999)). In meeting this burden, the withholding party has an obligation to put forth sufficient information to show that the withheld information meets the required characteristics of attorney-client privileged material. Accordingly, in order to properly invoke the attorney-client privilege, Respondents must show that the document "(1) involves 'confidential communications between an attorney and [his or her] client' and (2) relates to a 'legal matter for which the client has sought professional advice.'" *Judicial Watch, Inc. v. U.S. Postal Serv.*, 297 F. Supp. 2d 252, 267 (D.D.C.2004) (quoting *Mead Data Cent., Inc.,* 566 F.2d at 252).

Respondents must provide "sufficient information to enable [Petitioners and the court] to determine whether each element of the privilege ... has been satisfied." *Sonnino v. Univ. of Kan. Hosp. Auth.*, 220 F.R.D. 633, 659 (D.Kan. 2004). "On raising the privilege, a general allegation is insufficient. A clear showing must be met by setting forth the items or category objected to and the reason for that objection." *State of Colo. ex rel. Woodard v. Schmidt-Tiago Const. Co.*, 108 F.R.D. 731, 734 (D.Colo. 1985); *see also Peat, Marwick, Mitchell & Co. v. West*, 748 F.2d 540, 542 (10th Cir. 1984). Utilization of a privilege log allows for the provision of this information, and should identify:

> [a]t a minimum, . . . the author or origin of the document; any documents or materials attached to the document; all recipients of the document, including addressees and persons or entities receiving copies; the date of origin of the document; and a description o the contents of the document in sufficient detail as to reveal why it is subject to the asserted privilege.

*Carbajal v. Lincoln Beneficial Life Co.*, 2007 U.S. Dist. LEXIS 86753, at *8 (D.Colo. Nov. 13, 2007). Privilege log entries may be deemed insufficient where they are missing "vital

information" regarding whether the sender or recipient is an attorney, or a descriptive indication as to why the document fits the elements of the privilege – for example, that it was not shared with a larger group and therefore not confidential. *In re Application of Michael Wilson & Partners*, 2009 U.S. Dist. LEXIS 42046, at *19-*20 (D.Colo. Apr. 30, 2009). The "bedrock principle" that the party asserting the privilege must prove its applicability results in a waiver of privilege where the privilege is not sufficiently justified through a privilege log. *Lee v. State Farm Mut. Auto Ins. Co.*, 249 F.R.D. 662, 683 (D. Colo. 2008).

As WildEarth Guardians argues, and Respondents fail to refute, "the redacted e-mails bear none of the hallmarks of confidentiality, and the text of the emails undermine any implication that the documents were meant to be protected by the attorney-client privilege." Plaintiff's Motion to Compel Completion of the Administrative Records (Doc. 71), 36. The e-mail was "shotgunned" to eleven recipients, only two of whom were attorneys, and indiscriminately sought input from <u>any</u> of the eleven recipients. Given the context of the redacted communications, I am highly skeptical that they are subject to the protections of the attorney-client privilege.

My skepticism notwithstanding, I think it most prudent to avoid compelling production of the withheld sections for the time being. As Petitioners argue, the Respondents have not sufficiently described the withheld documents to allow me to thoroughly review their assertion of the attorney-client privilege. Accordingly, in order to allow meaningful consideration of Respondents' assertion of the privilege, Respondents shall submit a privilege log identifying for each document withheld on the basis of the attorney-client privilege: (1) the author or origin of the document; (2) any documents or materials attached to the document; (3) all recipients of the

document, including addresses and persons or entities receiving copies; (4) the date of the origin of the document; (5) and a description of the contents of the document in sufficient detail as to reveal why it is subject to the asserted privilege. Though Respondents argue much of this information has already been communicated, I find that they have not sufficiently described the contents of the redacted communications to allow me to meaningfully evaluate their assertion of the attorney-client privilege. In developing this privilege log, Respondents should clearly articulate why these communications, which seemingly lack any indicia of confidentiality, are subject to protection under the attorney-client privilege.

CONCLUSION

Upon consideration of WildEarth Guardians' arguments and examination of the materials they claim should be included in the appropriate Administrative Records, I find that the Administrative Records are properly remanded to the Respondents for completion. Upon remand of the Administrative Records, Respondents must include all materials directly and indirectly considered by the relevant decision makers. This should include, at a minimum, Exhibits 2A, 4-7, 9-10, 13, 15, and 17-24 for the Mine Plane Modification Administrative Record and Exhibits 25-26, 30-35, and 37-41 for the Lease Amendment Administrative Record.

I also find that Respondents have not met their burden in asserting the attorney-client privilege as the basis for redacting portions of nine pages of documents in the Lease Agreement Administrative Record. Though Petitioner urges that these documents should be included in the record, I find it most appropriate to allow the Respondents an opportunity to cure the deficiencies in their privilege log. Accordingly, Respondents shall submit an updated privilege log identifying for each document withheld on the basis of the attorney-client privilege: the

author or origin of the document; any documents or materials attached to the document; all recipients of the document, including addresses and persons or entities receiving copies; the date of the origin of the document; and a description of the contents of the document in sufficient detail as to reveal why it is subject to the asserted privilege.

Dated:  April 1, 2010.  **s/John L. Kane**
SENIOR U.S. DISTRICT JUDGE